

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-19-00108-CR

---

ROSENA BECKER-ROSS, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 4th District Court
Rusk County, Texas
Trial Court No. CR19-096

---

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Justice Burgess

# OPINION

A Rusk County jury found Rosena Becker-Ross guilty of three counts of abuse of official capacity, all Class A misdemeanors. *See* TEX. PENAL CODE ANN. § 39.02(b). The trial court imposed jury-recommended community supervision and, in accordance with the jury's verdicts, ordered her to pay a $1,000.00 fine and two $500.00 fines as a term and condition of her community supervision.

On appeal, Becker-Ross argues that (1) the evidence was legally insufficient to support the jury's findings of guilt, (2) the trial court erred in denying her motion to quash the information, and (3) the jury charge erred in including an instruction on the law of parties. We find the evidence legally sufficient to support the jury's verdicts. We also conclude that the trial court properly denied Becker-Ross's motion to quash and that there was no error in the jury charge. Accordingly, we affirm the trial court's judgments.

## I. Factual Background

The State alleged that Becker-Ross, a city administrator for the City of Mount Enterprise, Texas (City), pressured the city marshal, Parker Sweeney, to write a certain number of traffic tickets within a specified period even though traffic-offense quotas are illegal. The evidence at trial described how and why the offenses were committed.

James Reese, a retired state trooper with the Texas Department of Public Safety, testified that he had served as city councilman for the City for several years, was recently elected to Place 5 of the city council, and had studied the City's budget. According to Reese, from October 2017

2

through September 2018, $210,000.00 of the City's total $386,487.31 budget was collected through payment of traffic fines.

Reese testified that, as a result of the City's dependence on traffic tickets as a source of revenue, part of the city marshal's job required him to provide Becker-Ross with "weekly and monthly report of warrants worked, daily logs, collection calls, and moneys collected." Reese testified that Becker-Ross was the highest-paid City employee and made a salary of $55,800.00 for thirty-two hours of work per week.

Reese also testified that the city council never imposed a ticket quota on the prior marshal, David Collins. However, Reese went on to say that Becker-Ross "approached the council several times . . . and told [them] that [the prior] marshal wasn't writing enough tickets." Reese and the Mayor testified that the city council reduced Becker-Ross's pay due to the tight City budget. Reese further testified that Collins retired, and Cody Rollins took his position. However, according to Reese, Rollins did not stay in his position long.

The State introduced an audio recording of a telephone call wherein Becker-Ross told Sweeney that the budget was short by $150,000.00 because Rollins had failed to write enough traffic tickets and that the city council was ready to fire Rollins as a result. Becker-Ross also asked Sweeney if he would like to be the new city marshal. On the audio recording, Becker-Ross said that "the City Council was wanting" more traffic tickets. On May 15, 2018, Sweeney was hired as city marshal. Sweeney testified that, after the call, he believed Rollins was "fired for not writing enough citations" and that he would be expected to write more traffic tickets if he took the job. Sweeney testified that he recorded the call because Rollins warned him "there was a little bit of . .

3

. a push for traffic citations."  Yet, despite Becker-Ross's demand that he write more traffic citations, Sweeny accepted the city marshal job because he believed he "could show them where it was illegal and change it."

Nevertheless, the evidence showed that Becker-Ross was relentless in pushing Sweeny to write more traffic citations.  Just a few days after his hire, Becker-Ross texted, "[W]e have to get revenue back up first so . . . when will you be able to start writing tickets."  The month after his hire, she wrote that the City had "over 36,000 cars a day come through."  She continued, "[T]hat's why Council doesn't understand why tickets aren't written.  As you know that many can't all follow the rules."  On another call, Becker-Ross said, "[I]f we get that revenue in there we'll be good, because we can't have no more negative . . . . The warrant money is what's keeping us going. We just got to have more tickets."  Becker-Ross reminded Sweeney that "they" fired Rollins because he was not writing enough tickets.  Sweeney assumed Becker-Ross was referring to the city council.

Sweeney received text messages from Becker-Ross telling him that the City needed "at least twenty to forty [tickets] each week."  Sweeney recorded audio of Becker-Ross harassing him several times to "get that ticket count up," warning him that the city council said he was on probation, and threatening him by saying, "If you don't get tickets up you ain't going to be City Marshall, do you hear me?"  Becker-Ross also told him to write more tickets because he had "to pay for that salary," that "Johnny" from the city council looked every week to see how many tickets were being written, and that the city council would not wait six months to fire Sweeney if he did not get the ticket count up.  Becker-Ross texted Sweeney, "[A] couple of tickets a day is not going

4

to do it. I tried telling [Rollins] this but he wouldn't listen until it was too late. . . . Like I told you before the City Marshal position you need to have thirty to fifty tickets each Monday." She also texted that the ticket counts were "still not bringing in enough to pay [Sweeney's] salary" and that "fourteen tickets . . . . [was] not enough to justify having the City Marshal position."

Sweeney testified that he feared he would lose his job if he did not violate the law. He said that Becker-Ross "was running the show," that it "was very clear [the city council] voted every way she wanted to at every meeting," and that "everybody looked towards her before a vote was made." According to Sweeney, Becker-Ross "would tell her opinion on how the vote need[ed] to go and that's the way it went." Reese, the city attorney, and the mayor testified that Becker-Ross had no authority over Sweeney. However, Sweeney said that the mayor and city council member Judy Cox told him he needed to listen to and do whatever Becker-Ross said.

To put an end to the ticket quota, Sweeney copied Section 720.002 of the Texas Transportation Code and showed it to Becker-Ross and the city council during a meeting. Sweeney testified, "I . . . explained to them that what we were doing is illegal and also I showed Ms. [Becker-]Ross on more than one occasion but also at that same meeting." Nevertheless, the pressure to write tickets did not stop. Sweeny added, "I even had meetings with the mayor and mayor pro tem trying to change it but it didn't." Sweeney was fired.[1]

David Roberts, a sergeant with the Rusk County Sheriff's Department, testified that Becker-Ross turned herself in after she was charged in this case. According to Roberts, before she

---

[1]The City attorney testified that Sweeney was fired because he took sick time and did not notify the City that he had been sick until after he returned to work.

was booked into the jail, Becker-Ross said, "I won't be the only one going down." Roberts reported this statement to the investigating Texas Ranger, Chris Baggett. Baggett testified that imposition of traffic quotas was prohibited by Section 720.002 of the Texas Transportation Code. According to Baggett, the text messages from Becker-Ross to Sweeney showed that Sweeney "was being driven to write a certain amount of tickets, not traffic contacts, not warnings, but tickets and that that position was created as a revenue stream."

After hearing the evidence, the jury found Becker-Ross guilty of all three counts of abuse of official capacity.

## II.    Legally Sufficient Evidence Supports the Jury's Verdicts

### A.    Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offenses beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

6

Legal sufficiency of the evidence is measured by the elements of the offenses as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. Here, in a three-count information, the State accused Becker-Ross of abuse of official capacity, alleging that, on three separate occasions, she,

> with intent to obtain a benefit, intentionally and knowingly violate[d] a law related to the defendant's office OR employment as a public servant, namely, violate[d] Texas Transportation Code Section 720.002 while acting a[s] City of Mount Enterprise city/court administrator, by requiring or suggesting to Mount Enterprise City Marshall Parker Sweeney, a peace officer, that Parker Sweeney was required to or expected to issue a predetermined or specific number of any type or combination of types of traffic citations within a specified period.

### B.    Applicable Law

Abuse of official capacity is defined by Section 39.02 of the Texas Penal Code, which states, in relevant part, "A public servant commits an offense if, with intent to obtain a benefit . . . , [s]he intentionally or knowingly . . . violates a law relating to the public servant's office or employment." TEX. PENAL CODE ANN. § 39.02(a)(1). A public servant is "a person elected, selected, appointed, employed, or otherwise designated as . . . an officer, employee, or agent of government."[2] TEX. PENAL CODE ANN. § 1.07(a)(41) (Supp.). "'Benefit' means anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested." TEX. PENAL CODE ANN. § 1.07(a)(7) (Supp.). The phrase

---

[2]It is undisputed that Becker-Ross was a public servant and an unelected City official.

"'[l]aw relating to a public servant's office or employment' means a law that specifically applies to a person acting in the capacity of a public servant and that directly or indirectly:  (A) imposes a duty on the public servant; or (B) governs the conduct of the public servant."  TEX. PENAL CODE ANN. § 39.01.  By its information, the State alleged that the law violated by Becker-Ross was Section 720.002 of the Texas Transportation Code, titled "Prohibition on Traffic-Offense Quotas," which states,

> (b)      A political subdivision or an agency of this state may not require or suggest to a peace officer, . . . :
>
> > (1)      that the peace officer is required or expected to issue a predetermined or specified number of any type or combination of types of traffic citations within a specified period; . . .
>
> . . . .
>
> (e)      . . . . A violation of this section by a person who is not an elected official is a ground for removal from the person's position.

TEX. TRANSP. CODE ANN. § 720.002(b)(1), (e).

## C.      Analysis

Becker-Ross challenges two elements of the offense of abuse of official capacity.  She argues that there was legally insufficient evidence to show that she violated a law relating to her office or employment and that she intended to benefit from the violation.  We disagree.

First, Becker-Ross does not contest that the record shows she suggested to Sweeney that he meet a traffic-offense quota on three separate occasions.  Rather, Becker-Ross contends that Section 720.002 did not apply to her because she had no authority over Sweeney, who reported

8

directly to the mayor and city council. Therefore, Becker-Ross argues, she had no authority to suggest to Sweeney that he issue more traffic citations within a specified period.

By her argument, Becker-Ross assumes that the State is required to prove that she had authority over Sweeney. Yet, Section 720.002 imposes no such requirement. Instead, as made clear by subsection (e), Section 720.002 applies to any official who suggests to a peace officer that he is required or expected to meet a traffic-offense quota. TEX. TRANSP. CODE ANN. § 720.002(e). The evidence clearly establishes that on three occasions, Becker-Ross suggested to Sweeney that he was required or expected to meet a traffic-offense quota. Because Becker-Ross, in her position as a city administrator, was an unelected official, Section 720.002 applied to her. *See id.* As a result, we find the evidence legally sufficient to show, beyond a reasonable doubt, that Becker-Ross violated a law relating to her public office or employment.

Second, Becker-Ross argues that the evidence was legally insufficient to show that she had the required mens rea because there was no evidence that she received a benefit from violating Section 720.002. Yet, the State was not required to prove that Becker-Ross received a benefit by urging Sweeney to issue more traffic tickets, only that she intended to receive one. *See* TEX. PENAL CODE ANN. § 39.02(a). "Proof of a culpable mental state is often made by circumstantial evidence." *Rhymes v. State*, 536 S.W.3d 85, 95 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Louis v. State*, 329 S.W.3d 260, 268 (Tex. App.—Texarkana 2010), *aff'd*, 393 S.W.3d 246 (Tex. Crim. App. 2012)). "Intent may . . . be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

9

The evidence showed that Becker-Ross was the highest paid City official, that her salary was paid from the City's budget, and that a large part of the City's budget came from traffic ticket fines. Based on this fact, Becker-Ross's emails to Sweeney showing that salaries would have to be cut if Sweeney did not meet the traffic-offense quota, and testimony that Becker-Ross's salary was cut due to the failure to bring in traffic ticket revenue, the jury could have reasonably concluded that Becker-Ross intended to obtain the benefit of maintaining her higher salary by violating Section 720.002.

We find that there is sufficient evidence from which a rational jury could have found, beyond a reasonable doubt, that Becker-Ross, a public servant and unelected official, intentionally or knowingly, on three separate occasions, violated Section 720.002 of the Texas Transportation Code, a law related to her office or employment, with the intent to obtain a benefit. Accordingly, we overrule Becker-Ross's first point of error.

## III. The Trial Court Properly Overruled the Motion to Quash the Information

### A. Standard of Review

Becker-Ross filed a motion to quash the information on the ground that it failed to provide her with adequate notice of the offenses. "The Texas Constitution and Texas Code of Criminal Procedure require that [a charging instrument] provide an accused with adequate notice." *State v. Brown*, 314 S.W.3d 487, 492 (Tex. App.—Texarkana 2010, no pet.) (citing TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05 (Vernon 2005)). "This constitutional mandate requires that the charging instrument convey adequate notice from which the accused may prepare his or her defense." *Id.* "Thus, to ensure proper notice, 'the [charging instrument] must be specific

10

enough to inform the defendant of the nature of the accusations against [her].'" *Smith v. State*, 494 S.W.3d 243, 248 (Tex. App.—Texarkana 2015, no pet.) (quoting *Smith v. State*, 297 S.W.3d 260, 267 (Tex. Crim. App. 2009)).

"[T]o comprise an [information] within the definition provided by the constitution, an instrument must charge[] (1) a person[] (2) with the commission of an offense." *Id.* at 247 (first and second alterations in original) (quoting *Mantooth v. State*, 269 S.W.3d 68, 72 (Tex. App.—Texarkana 2008, no pet.)). "[A] written instrument is an indictment or information under the Constitution if it accuses someone of a crime with enough clarity and specificity to identify the penal statute under which the State intends to prosecute, even if the instrument is otherwise defective." *Id.* (alteration in original) (quoting *Mantooth*, 269 S.W.3d at 72). "[T]he State need not allege facts that are merely evidentiary in nature." *Id.* at 250 (quoting *Mays v. State*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998)).

"The sufficiency of an indictment is a question of law reviewed de novo." *Brown*, 314 S.W.3d at 492 (citing *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004)). "In determining whether a defendant has sufficient notice to prepare his or her defense, we must determine whether the charging instrument fails to provide all the requisites of 'notice.'" *Id.* (citing *Olurebi v. State*, 870 S.W.2d 58, 61 (Tex. Crim. App. 1994)). "Subject to rare exceptions, not applicable here, an indictment [or information] which tracks the statutory language will satisfy constitutional and statutory notice requirements." *Id.* (citing *State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998)).

**B.** **Analysis**

Becker-Ross argues that the information did not provide adequate notice since it did not allege how she intended to benefit from the imposition of a traffic-offense quota. In support of her argument that the information was "impermissibly vague on what benefit she intended to receive," Becker-Ross cites *State v. Campbell*, 113 S.W.3d 9 (Tex. App.—Tyler 2000, pet. ref'd). That case is distinguishable.

In *Campbell*, the State alleged that a police officer abused his official capacity by failing to perform work duties on three days, in violation of a Houston Police Department's general order, "with intent to obtain a benefit and harm and defraud another."[3] *Id.* at 11. In his motion to quash the information, Campbell argued that the information failed to allege a crime or "explain specifically how Defendant Campbell benefitted from his alleged absence on three separate days, or how he harmed and defrauded another as a result of his absence." *Id.* In upholding the trial court's decision to quash the information, the Tyler Court of Appeals recited the rule that, "[i]f the manner or means by which an act is done makes an otherwise innocent act a criminal offense, it is necessary to allege the fact showing the manner or means which makes the act a criminal offense." *Id.* at 12 (citing *Ex parte Holbrook*, 609 S.W.2d 541, 543 (Tex. Crim. App. 1980)). Although the information tracked the statutory language, the Tyler Court of Appeals noted that "failing to go to work is not inherently criminal and it is the failure to do so with intent to obtain a benefit or harm or defraud another which raises such an act to a criminal level." *Id.* at 13. Because "the harm of

---

[3]Campbell argued that the Houston Police Department's general order was not a law since it was not "the constitution or a statute of this State or of the United States, a written opinion of a court of record, a municipal ordinance, an order of a county commissioners court, or a rule authorized by and lawfully adopted under a statute." *Campbell*, 113 S.W.3d at 11 (quoting TEX. PENAL CODE ANN. § 1.07(a)(3)). The Tyler Court of Appeals did not address the issue. *Id.* at 13.

taking a day off from work [was] not apparent from the face of the [information]," the Tyler Court of Appeals found it necessary for the State to allege the mens rea with more particularity. *Id.* at 13.

*Campbell* is not instructive for two reasons. First, in *Campbell*, the defendant did not have adequate notice from which to prepare a defense because the information in that case did not definitively allege a crime and could have been read as alleging only innocent conduct. Here, the allegation that Becker-Ross violated Section 720.002 the Texas Transportation Code was not consistent with innocent conduct. *See* TEX. TRANS. CODE ANN. § 720.002(e).

Next, in *Campbell*, the State alleged every mens rea listed in Section 39.02, without specifying which mens rea it was relying on. Because the mens rea was the critical element which transformed Campbell's seemingly innocent actions into criminal actions, Campbell did not have sufficient notice of the element that would be the crux of his defense. Here, the only mens rea used in Section 39.02 is intent to benefit, and the Texas Penal Code defines "benefit" as "anything reasonably regarded as economic gain or advantage." TEX. PENAL CODE ANN. § 1.07(a)(7). "Generally, when a term is defined in the penal statutes, it is permissible to use that term without further allegations in the indictment because the defendant is presumed to be on notice of statutory definitions." *State v. Goldsberry*, 14 S.W.3d 770, 773 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (citing *Thomas v. State*, 621 S.W.2d 158, 161 (Tex. Crim. App. [Panel Op.] 1980)). This is because "[d]efinitions of terms and elements are essentially evidentiary and need not be alleged in the indictment [or information]." *Id.* at 774. The information also "need not plead evidence relied on by the State." *Id.* (citing *Thomas*, 621 S.W.2d at 161).

13

Because "benefit" is defined in the Texas Penal Code, the State's information showed how Becker-Ross intended to benefit—by economic gain or advantage. Just as in *Goldsberry*, we find that further showing "[h]ow the appellee . . . benefitted . . . is evidentiary in nature; therefore, the State was not required to allege further details about the 'benefit' in the [charging instrument]." *Id.*

In sum, it is clear that Becker-Ross had notice of the offenses alleged against her. The State's three-count information against her described the charges as "ABUSE OF OFFICIAL CAPACITY, P.C. 39.02(a)(1), a class A misdemeanor." It alleged that, on three separate occasions, Becker-Ross intentionally and knowingly violated Section 720.002 of the Texas Transportation Code, a law related to her office or employment as city administrator, with intent to obtain a benefit, i.e., economic gain or advantage, "by requiring or suggesting to Mount Enterprise City Marshall Parker Sweeney, a peace officer, that Parker Sweeney was required to or expected to issue a predetermined or specific number of any type or combination of types of traffic citations within a specified period." The State's information tracked the statutory language and set forth each and every element the State was required to prove at trial. As a result, we find that the State's information was sufficient to allege that Becker-Ross committed the offenses of abuse of official capacity.

Because the trial court did not err in overruling Becker-Ross's motion to quash, we overrule Becker-Ross's second point of error.

**IV.     There Is No Error in the Jury Charge**

In her last point of error, Becker-Ross argues that the trial court erred in instructing the jury on the law of parties. We employ a two-step process in our review of alleged jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32). "[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007)).

"Each party to an offense may be charged with commission of the offense." TEX. PENAL CODE ANN. § 7.01(b). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a). A "person is criminally responsible for an offense committed by the conduct of another if[,] . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2); *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013). In determining whether Becker-Ross was a party to abuse of official capacity, we may consider "events before, during, and after the commission of the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting *Wygal v. State*, 555 S.W.2d 465,

468–69 (Tex. Crim. App. 1977)). We may consider circumstantial evidence showing Becker-Ross had an understanding and common design to commit the offense. *See Ransom v. Texas*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (op. on reh'g) (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

"When the evidence is sufficient to support both primary and party theories of liability, the trial court does not err in submitting an instruction on the law of parties." *Id.* We have already concluded that the State presented sufficient evidence showing Becker-Ross's guilt as a primary party to the offense. In addition, audio recordings and text messages of Becker-Ross suggested that the city council reviewed the ticket counts on a regular basis and was behind the urge to write more traffic tickets. Sweeney testified that the prior marshal was fired for not writing enough traffic tickets and that he had raised the illegality of citation quotas with the city council and the mayor, to no avail. Roberts testified that, before she was booked into the jail, Becker-Ross said, "I won't be the only one going down," implying that others were involved in the offenses. Therefore, there was evidence from which a jury could have also found Becker-Ross guilty as a party to the offense.

We conclude that the trial court's inclusion of the party-liability instruction was not error. Accordingly, we overrule Becker-Ross's last point of error.

16

## V.     Conclusion

Based on the reasons set forth herein, the judgment of the trial court is affirmed.


Ralph K. Burgess
Justice

Date Submitted:     December 10, 2019
Date Decided:       January 13, 2020

Publish